**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**ELIZABETH SUE SANDERS,**

       **Plaintiff,**

                                     **Civil Action 2:16-cv-1014**
**vs.**                                    **Judge Algenon L. Marbley**
                                     **Chief Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

       **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Elizabeth Sue Sanders, brings this action under 42 U.S.C. §§ 405(g) and

1383(c)(3) for review of a final decision of the Commissioner of Social Security

("Commissioner") denying her applications for social security disability insurance benefits and

supplemental security income. This matter is before the Chief United States Magistrate Judge

for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 16), the

Commissioner's Memorandum in Opposition (ECF No. 24), and the administrative record (ECF

Nos. 10 and 11). For the reasons that follow, it is **RECOMMENDED** that the Court

**OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

### I.      BACKGROUND

Plaintiff protectively applied for security disability insurance benefits and supplemental

security income January 2011, asserting that a back injury causing a herniated disc constitutes a

disability, which began on November 17, 2009. (R. at 192–200, 248.) After a hearing attended

by Plaintiff and her attorney, an Administrative Law Judge ("ALJ"), John M. Dowling, denied Plaintiff's application on October 15, 2012. (R. at 14–23, 32–71.) The Appeals Council denied Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. (R. at 1–3.)

Thereafter, Plaintiff filed a civil action in this Court, challenging the ALJ's decision. *Sanders v. Commissioner of Social Security,* No. 2:14-cv-00249. On March 4, 2015, this Court remanded the Commissioner's decision for further proceedings. (R. at 1096–1119.) The Appeals Council vacated the ALJ's decision and remanded the case to an ALJ on April 27, 2015. (R. at 1121–25.)

Plaintiff, represented by counsel, appeared and testified at an administrative hearing conducted on November 13, 2015. (R. at 1026–50.) Following this hearing, medical interrogatories were sent to two medical experts, including Ronald E. Kendrick, M.D., an orthopedic surgeon. (R. at 1615–19, 1625–27.) At Plaintiff's request, ALJ Jason C. Earnhart conducted a supplemental hearing on May 25, 2016, to examine the orthopedic medical expert. (R. at 981–87, 991–1003.) A vocational expert also appeared and testified at the hearing. (R. at 1006–15.) On June 24, 2016, ALJ Earnhart issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act at any time since November 17, 2009, her alleged onset date, through June 24, 2016. (R. at 946–65.) The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 1–3.) Plaintiff then timely commenced the instant action.[1]

---

[1]The administrative transcript does not contain a copy of Plaintiff's Request for Review

## II.   HEARING TESTIMONY

### A.   Plaintiff's Testimony

At the November 2015 administrative hearing, Plaintiff testified that she was five feet, seven inches tall, and weighed 312 pounds.  (R. at 1026.)  She has a driver's license and there has not been a time in the last six years where she did not drive.  (R. at 1027.)   She drives to the grocery store and to doctors' appointments.  (*Id.*)  Plaintiff testified that she drives by braking with her left foot and pushing her right knee when accelerating with her right foot on the gas pedal.  (*Id.*)

Plaintiff testified that she had injured her back in November 2009 while raking leaves; she "twisted and herniated two discs."  (R. at 1030.)  She continued that a year after she initially hurt her back, she fell which then ruptured one of the discs that is herniated and she herniated another disc, resulting in two herniated discs and a ruptured disc.  (R. at 1031.)   Plaintiff's pain in her legs has worsened and she testified that she also has nerve pain in [her] left leg.  (*Id.*)

Plaintiff began using a prescribed cane in 2010.  (*Id.*)  She testified that she has no feeling on the bottom of her right foot.  (R. at 1032.)  When asked why she felt she can't work she replied that she could not sit, stand, or walk for long periods.  (R. at 1032–33.)  Plaintiff testified that she is incontinent, a condition which started after she fell on the ice.  (R. at 1036.)

Plaintiff also testified to her mental impairments, nothing she suffered from depression, anxiety, posttraumatic stress, panic attacks, and impaired memory.  (R. at 1034–35, 1099–1100.) She said that she had attempted suicide a few times when she was with her husband and three times since leaving him.  (R. at 1039.)

---

of Hearing Decision Order or the Appeals Council adoption of the ALJ's decision.

Plaintiff testified that she has both Facebook and Twitter accounts and accesses Facebook twice a week. (R. at 1027–28.) Plaintiff estimated that she had 150 friends on Facebook and said that she posted photos of her dogs. (R. at 1028.) She attended three years of college but did not graduate because her husband at the time interrupted her study. (R. at 1029.)

Plaintiff testified that she vacuums and washes dishes but takes frequent breaks. (R. at 1033.) She prepares quick meals because she cannot stand at the stove and monitor the food. (R. at 1033–34.) She needs to lay down two to three times a day with a pillow between her knees because of her pain. (R. at 1041–42.) She testified that steroid injections had not resulted in reduced pain. (R. at 1042.) She said that a transcutaneous electrical nerve stimulator ("TENS") unit helped with her muscles but she would have to wear it all day and have in constantly on, so she did not use it that often. (R. at 1042–43.)

## B.    Medical expert

Ronald E. Kendrick, M.D., the medical expert, responded to interrogatories and testified at the May 25, 2016 administrative hearing. (R. at 976-1014.) In his interrogatory responses, Dr. Kendrick concluded as follows:

> The claimant's subjective to pain is the primary determinant in her level of function. In other words, absent her experience of pain she would be capable of medium work. In view of her pain complaints, she would be restricted to sedentary work, lifting and carrying 10 lbs. occasionally and less than 10 lbs. frequently; [standing and walking two of eight hours]; sitting [six of eight] hours; bending, stooping, kneeling and crawling occasionally; climbing stairs occasionally[,] but no ladders, ropes or scaffolds; no restrictions apply to the upper extremities. It is noted in the record that she uses a cane on some occasions but it is not medically necessary as a substitute for any structural or functional deficiency.

(R. at 1627.)

At the May 25, 2016 administrative hearing, Dr. Kendrick testified that he did not see anything in the record that anyone referred to a problem with her balance and that he did not see a need for a cane. Dr. Kendrick explained that canes are used to provide additional support if there is a loss of structure or function. (R. at 985.) He testified that he did not see any such loss in the record. (*Id.*) Dr. Kendrick continued that Plaintiff had normal strength throughout and that was nothing wrong with the structural integrity of her extremities. (R. at 985-86.)

Dr. Kendrick opined that Plaintiff does not meet or equal any listing. (R. at 986.) He further testified that he did not "see anything in the record where she had both motor and sensory loss as a result of anything going on in her back compromising a nerve, and there's no evidence that she has any significant compromise of a nerve. She's been seen by two neurosurgeons indicating that there's no significant compromise in the record that contributed to any motor and sensory loss." (R. at 987.)

When examined by Plaintiff's counsel, Dr. Kendrick noted that Dr. Singh used an "unsound thought process" when he diagnosed Plaintiff with right lower extremity neuropathy when there is no evidence and when he said that Plaintiff needed a cane. (R. at 991.)

Dr. Kendrick testified that Plaintiff had an appropriate neurological motor test with the EMG and it was normal. He explained that it was not a diagnosis just because it was suggestive of something wrong. (R. at 999–1000.)

Plaintiff's counsel questioned Dr. Kendrick about Plaintiff's claims of pain and missing work:

Q      I did notice that you give Elizabeth some fairly significant physical restrictions based on her pain.

A      Yes.

Q        Which led me to believe that you gave credence to her reports of pain.

A        Absolutely.

Q        Okay.  So her reports of pain are credible?

A        Yes.

Q        [O]ne of the things that, in addition of course to the pain issue, and I think we've covered that ad nauseam, but her treating physician also opined that she would suffer from absenteeism, have difficulty adhering to a 40 hour work week due to fluctuating pain. Would you also find that to be credible?

A        I think she would miss some days, yes.

Q        Would she miss several a month, do you think?

A         There's no way to predict it.

Q        Okay.  But you think missing some days is reasonable.

A        Yes.

Q        And does that date back to her alleged onset date or some later point in time?

A        I'd say it would go back to the entire period that she was under pain management, or being treated for her chronic pain, yes.

(R. at 1000.)

## C.    **Vocational Expert Testimony**

The vocational expert ("VE") testified at the administrative hearing that Plaintiff's past

jobs include an administrative clerk, and an administrative assistant, both at the light exertion,

semi-skilled level; and an automobile assembler, medium in exertion and unskilled.  (R. at 1006–

10.)

The ALJ proposed a series of hypotheticals regarding Plaintiff's residual functional capacity ("RFC") to the VE. (R. at 1010–11.) Based on Plaintiff's age, education, and work experience and the RFC ultimately determined by the ALJ, the VE testified that Plaintiff could not perform her past relevant work, but could perform approximately 557,000 unskilled, sedentary exertional jobs in the national economy such as a machine tender-feeder, bench assembly-table worker, and surveillance system monitor. (R. at 1011.)

The VE was questioned about tolerance for absenteeism generally and absenteeism during a probationary period at work:

Q    Absence from the work place?

A    A day to a day and a half a month. 18 days out of the year for at-will employment.

Q    A person in excess of those tolerances, can they sustain competitive employment?

A    Excuse me?

Q    A person in excess of those tolerances that you just said to me, can they sustain competitive employment?

A    No .

(R. at 1013)

Q    The types of jobs that you described in response to the Judge's first hypothetical, would those types of unskilled jobs typically have some kind of a probationary period at the beginning? Maybe 60–90 days?

A    Yes.

Q    And during that 60 to 90, well, how long would the probationary period be?

A    It can vary. It could be as little as 30 days, could be as much as six months. It really depends on the work place.

Q      And during that probationary period is any absenteeism tolerated?

A      Good question.  Generally not. Not when a person is not vested.  When he's vested then it's 18 days out of the year, but during the probationary period generally no.

Q      So your response to the Judge's fourth hypothetical about absenteeism assumes that the person would be able to survive that 30 day to six month probationary period.

A      I'm sorry, what was the question?

Q      The absenteeism rate, I think this is what you just stated.  But the 18 days per year—

A      Right.

Q      That's after we get through the probationary period.

A      True.  Yes.

(R. at 1014–15.)

## III.    MEDICAL RECORDS

**A.     <u>Physical Impairments</u>**

**1.      Parminder B. Singh, M.D.**

Plaintiff's primary care physician, Parminder B. Singh, M.D., issued three opinions concerning Plaintiff's ability to perform work activities.

In November 2011, Dr. Singh diagnosed Plaintiff with lower back pain.  (R. 880.)  He reported that her back pain radiated down her legs below her knee to her foot, she experienced neuropathy, anxiety and depression.  (*Id*.)  Dr. Singh acknowledged that emotional factors contributed to the severity of Plaintiff's symptoms and functional limitations.  (*Id*.)  Dr. Singh did not identify any positive objective signs or other clinical findings.  (*Id*.)  Dr. Singh opined

that Plaintiff's pain was so severe that it would often interfere with her attention and concentration.  (R. at 881.)  Dr. Singh also opined that Plaintiff's medication would impair her reflexes and would make her drowsy, requiring that she lay down when she takes the medication.  (*Id.*)  As to her functional abilities, Dr. Singh opined that Plaintiff could not walk any city blocks without resting or experiencing severe pain, sit for more than thirty minutes, or stand for more than ten minutes.   (*Id*.)  Dr. Singh also opined that Plaintiff could sit and stand for less than two hours in an eight-hour workday, needed to take a six-minute walk every twenty minutes in an eight-hour workday, and would need  to use a cane or other assistive device when engaging in occasional standing or walking. (R. at 882.)  According to Dr. Singh, Plaintiff could occasionally lift and carry less than ten pounds, never bend or twist, and would be absent more than three times a month. (R. at 883.)

In September 2012, Dr. Singh completed a medical questionnaire and confirmed that Plaintiff's level of functioning was unchanged since November 2011.  (R. at 936.)

In December 2014, Dr. Singh opined that Plaintiff was "unable to perform work duties due to several medical conditions[.]"  (R. at 1765.)

### 2. Janet Bay, M.D.

In September 2010, Plaintiff saw Janet Bay, M.D., for a neurosurgical consultation in regard to her complaints of low back pain with right sciatica.  (R. 1466–67.)  On examination, Dr. Bay found Plaintiff as a well-developed, obese woman who walks with a limping gait favoring the right leg.  (R. 1466.)  She was able to toe and heel walk with some assistance.  (*Id*.)  Plaintiff's range of movement in her low back was limited to pain.  (*Id*.)  The straight leg raising maneuver was positive on the right and negative on the left.  (*Id*.)  She had pain inhabitation in

all testable muscle groups of her right leg, somewhat worse distally than proximally.  (*Id.*)  Her knee jerks were 1+ bilaterally.  (*Id.*)  She had a 1 + right ankle jerk and absent left ankle jerk and complains of some subjective numbness in an L5 and S1 distribution on the right.  (*Id.*)  Dr. Bay noted that she reviewed an EMG which was performed in June 2010 which was suggestive of a very mild right S1 radiculopathy but could also be seen with sciatic nerve problems.  (*Id.*)  An MRI from February 2010 showed a minor midline disk bulge at L4-5.  (*Id.*)  Dr. Bay noted the MRI showed no stenosis or herniated disks.  (*Id.*)  Dr. Bay reported that she did not "see a source in her back for sciatica, but she [Plaintiff] clearly has sciatica that sounds like nerve pain."  (*Id.*)  Dr. Bay concluded that Plaintiff did not have a surgically treatable back lesion.  (R. at 1467.)

### 3. Christian Bonasso, M.D.

Plaintiff treated with neuro-surgeon, Christian Bonasso, M.D., beginning in February 2010.  At that time, Dr. Bonasso treated Plaintiff with a round of epidural steroids and did not recommend surgery at that point.  (R. at 396–97.)  On April 21, 2010, Plaintiff reported that after receiving two epidural steroids injections, they significantly aggravated her symptoms.  Dr. Bonasso noted that Plaintiff's examination was "completely intact."  Dr. Bonasso ordered an EMG of Plaintiff's right lower extremity and noted if there the test is inconclusive, "there is probably nothing I will be able to offer her unfortunately."  (R. at 398.)  An EMG taken on June 1, 2010, was "suggestive of a right S1 radiculopathy this also could be seen in sciatica."   (R. at 394–95.)  On June 6, 2010, Dr. Bonasso noted the EMG findings were "mild" and reported that he did not know "if there is any role for surgery for her."  (R. at 399.)  By July 2010, Dr. Bonasso noted Plaintiff's flexion and extension x-rays do not show instability and he did not

recommend surgery given Plaintiff's age.  (R. at 400.)  Dr. Bonasso prescribed a TENS unit.  (*Id*.)

Plaintiff underwent a discogram on her lumbar spine on October 11, 2011, which revealed a grade 5 annular tear at the L5-S1 level with posterior disk bulge.  (R. at 860–61.)

Plaintiff underwent an MRI of the lumbar spine in February 2015, which showed a mild decrease in size of a soft disc protrusion at the L5-S1 level.  (R. at 1307.)   However, there was a suggestion of a new annular tear at that level, only nominal soft disc displacement of the L3-4 level, and only shallow soft disc displacement at the L4-5 level without compressive discopathy.  (*Id*.)

On August 19, 2015, Plaintiff presented to Dr. Bonasso, complaining of intermittent left lower extremity pain.  (R. at 1305.)  Dr. Bonasso noted that Plaintiff's examination was difficult to assess because although Plaintiff had limited motion in her right leg, she had normal strength in her left leg and was able to walk.  (*Id*.)  Dr. Bonasso reported that Plaintiff's MRI revealed some disc bulging, but would not recommend surgery.  (*Id*.)

### 4.      Nikesh Batra, M.D.

Plaintiff consulted with a pain management specialist, Nikesh Batra, M.D., in March 2010 with complaints of lower back and right lower extremity pain.  (R. at 379–80.)

Dr. Batra found that Plaintiff walked with a slightly antalgic gait and showed some decrease in the range of motion of the lumbar spine.  (R. at 380.)  Dr. Batra assessed lumbar radiculitis and spondylosis as well as internal disk derangement.  (*Id*.)  He recommended steroid injections and reported that Plaintiff wishes to proceed with the injections.  (*Id*.)

### 5.      Kelly Cranston, C.N.P.

In May 2016, Kelly Cranston, a certified nurse practitioner in Dr. Singh's office, completed a medical assessment, reporting that Plaintiff's pain is medically reasonable based on her degenerative disc disease and disc herniation. (R. at 2031.) Nurse Cranston opined that Plaintiff would frequently miss days of work, experience difficulty maintaining focus and attention, and need to move around frequently and lie down intermittently to reduced pain. (*Id*.) Nurse Cranston concluded that based on Plaintiff's right lower extremity neuropathy, an assistive walking device is medically necessary. (R. at 2032.)

### 6. Consultative Examination

Plaintiff was examined on November 22, 2011, by Judith Brown, M.D., for disability purposes. (R. at 862–70.) Plaintiff's chief complaint was back problems. (R. at 862.) During the examination, Plaintiff walked with a cane, had an antalgic gait, and dragged her right leg behind her but was able to walk without the cane when asked to do so and was stable at station and comfortable in the supine and sitting positions. (R. at 863.) Dr. Brown noted Plaintiff was morbidly obese at five feet, seven inches tall, and weighing 307 pounds. (*Id*.) She was able to stand on her right leg alone, with some difficulty, and she could stand on her heels and toes. (R. at 865.) She had some decreased sensation in her right leg and she had difficulty arising from a squat. (*Id*.) Dr. Brown concluded that muscle testing was unreliable, as there was too much variation and breakaway weakness. (R. at 867.) Dr. Brown also found on examination that Plaintiff had normal grasp, manipulation, pinch, and fine coordination with her hands. (*Id*.) Dr. Brown concluded that Plaintiff's ability to perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, carrying and traveling as well as pushing and

pulling heavy objects appears to be at least mildly impaired by her examination findings. (R. at 866.)

### 7. State Agency Review

W. Jerry McCloud, M.D., reviewed Plaintiff's medical record on May 2, 2011. (R. at 77–78.) He found Plaintiff to be partially credible, noting that she had no motor deficits or atrophy. (R. at 77.) Dr. McCloud determined Plaintiff was capable of light exertional work, capable of occasionally lifting and/or carrying up to twenty pounds and frequently lifting and/or carrying up to ten pounds; able to stand and/or walk and sitting for about six hours in an eight-hour work day. (R. at 78.)

Anton Freihofner, M.D., reviewed Plaintiff's medical record upon reconsideration in December 2011. (R. at 103–05.) Dr. Freihofner determined that Plaintiff could perform light exertional work but would be limited in standing/walking due to pain complaints without clear cause. (R. at 103–04.) He noted that she appeared to have full strength intact in the lower extremity and neurodiagnostics/MRI do not show radiculopathy, so ambulation device is not medically necessary. (*Id.*)

### B. Mental Impairments

### 1. Consultative Evaluation

In June 2011, T. Rodney Swearingen, Ph.D., examined Plaintiff for disability purposes. (R. at 609–13.) Plaintiff reported that she was taking medication for depression. She was not working due both to being laid off and to problems with her back. (R. at 610–11.) Plaintiff told Dr. Swearingen that she did not use any assistive devices. (R. at 610.) Plaintiff reported that she spent her day watching television and reading and that her reading skills were "good." (R. at

611.)  She was able to do household chores and socialize with friends.  (R. at 611.)  Her affect

was reactive but her prevailing mood was depressed and anxious.  (*Id.*)  She reported crying

spells and had recurrent thoughts of death or suicide.  (*Id.*)  Her concentration and persistence

were good and she had no difficulty following instructions.  Dr. Swearingen diagnosed a major

depressive disorder.  (R. at 612.)  He concluded that Plaintiff had no limitations in any areas of

work-related functioning.   (R. at 613.)

### 2.    State agency review

Karla Voyten, Ph.D., reviewed Plaintiff's file in June 2011. (R. at 76–77.)  On

reconsideration, Joseph Edwards, Ph.D., reviewed the record in December 2011.  (R. at 101–02.)

According to these psychologists, Plaintiff was mildly restricted in her activities of daily living;

had no difficulties in maintaining social functioning or in maintaining concentration, persistence

and pace.  (R. at 76, 101–02.)

## IV.  THE ADMINISTRATIVE DECISION

On June 24, 2016, ALJ Earnheart issued his decision.  (R. at 946–65.)  Plaintiff met the

insured status requirements through December 31, 2013.  (R. at 946.)  At step one of the

sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step
sequential evaluation of the evidence.  *See* 20 C.F.R. §416.920(a)(4).  Although a dispositive
finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th
Cir. 2007), if fully considered, the sequential review considers and answers five questions:

    1.      Is the claimant engaged in substantial gainful activity?
    2.      Does the claimant suffer from one or more severe impairments?
    3.      Do the claimant's severe impairments, alone or in combination, meet or
            equal the criteria of an impairment set forth in the Commissioner's Listing of
            Impairments, 20 C.F.R. Subpart P, Appendix 1?
    4.      Considering the claimant's residual functional capacity, can the claimant

gainful activity since November 17, 2009, the alleged onset date. (R. at 948.) ALJ Earnheart found that Plaintiff had the severe impairments of degenerative disease of her lumbosacral spine with spondylosis; obesity; and affective and anxiety-related disorders. (*Id.*) The ALJ determined that Plaintiff's peripheral edema, neuropathy, and fibromyalgia are not severe impairments. (R. at 949.) He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

> The claimant has the residual functional capacity to perform sedentary work . . . except she can frequently balance and occasionally stoop, kneel, crouch, crawl, operate left foot controls, and climb ramps and stairs, but cannot operate right foot controls or climb ladders, ropes, or scaffolds. She can frequently be exposed to vibrations and hazards, such as moving mechanical parts and unprotected heights. She can work in environments without a fast production pace, more than occasional interactions with coworkers, supervisors, but never with the public or more than occasional changes in the work setting.

(R. at 952.) In reaching this determination, ALJ Earnhart assigned "significant" weight to Dr. Kendrick's interrogatory responses and testimony, except to the extent that his testimony could be construed as supporting the need for excessive missed days of work due to Plaintiff's pain complaints. (R. at 957.) ALJ Earnhart also noted that in giving some deference to Plaintiff's lower extremity complaints, he found that Plaintiff can no more than occasionally operate left foot controls and never operate right foot controls, though, consistent with Dr. Kendrick's

---

perform his or her past relevant work?
5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

opinion, and the assessment of Dr. Freihofner.  He did not find that a cane is necessary within the stand and walk parameters of sedentary work activity.  ALJ Earnhart also assigned "some" weight to Dr. Brown's assessment, as a limitation to sedentary work with the above-identified postural limitations would appear to accommodate her assessment, though she did not assess specific work-related limitations.

Relying on the VE's testimony, ALJ Earnheart concluded that Plaintiff can perform jobs that exist in significant numbers in the national economy.  (R. at 963.)  He therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 964.)

## VII.   STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VIII. ANALYSIS

In her Statement of Errors, Plaintiff advances three contentions of error. First, Plaintiff argues that the ALJ erred in discounting the opinion of treating physician Perminder Bobby Singh, M.D., as related to the impact of Plaintiff's pain on her ability to maintain consistent attendance at work. (ECF No. 16 at 5–15.) Plaintiff next argues that the ALJ's evaluation of Plaintiff's symptoms fails to follow the requirements of SSR 16-3p and is not supported by substantial evidence. (*Id*. at 16–17.) Finally, Plaintiff argues that the ALJ failed to build an accurate and logical bridge between Dr. Kendrick's testimony and the RFC because he did not address her rate of absenteeism. (*Id*. at 17–20.) The Court addresses these contentions in turn.

### A. Evaluation of Dr. Singh's Opinion

Plaintiff argues that ALJ Earnheart failed to properly evaluate Dr. Singh's treating physician opinion. (*Id*. at 5–15.) Specifically, Plaintiff contends that the ALJ's evaluation was

flawed in the following five ways: the evaluation was inconsistent with other substantial evidence in the case record or other medical source opinions; the ALJ's consideration that Dr. Singh is not a specialist and that Plaintiff's treatment had been conservative; the ALJ's reliance on "[u]nreliable findings, particularly foot drop"; the ALJ opinion is inconsistent with activities of daily living; and that the ALJ erred to the extent he relied in part on an assessment of the claimant's mental work-related functioning. (*Id.*) The Undersigned finds Plaintiff's first contention of error to be without merit.

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(c). The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . ." 20 C.F.R. § 416.927(c)(2); *Blakley*, 581 F.3d at 408. If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id*. Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

### 1. Inconsistent with other substantial evidence or medical source opinions

The ALJ considered Dr. Singh's opinion regarding Plaintiff's complaints of pain and resulting absenteeism, but assigned it "little weight" because, *inter alia*, it was not consistent with other substantial evidence in the case record or the opinions of other medical sources of record, reasoning as follows:

> Dr. Singh's assessed limitations are also inconsistent with intermittent reports summarized above that the claimant was active and with her documented activities of living as summarized throughout this decision, including doing chores, light housework, watching television, reading, sharing cooking responsibility with her husband, dishwashing, vacuuming, driving a car (albeit that she alleged that she drove two-footed), having 150 friends on Facebook, doing her fingernails in a very decorative fashion, and getting arrested when with a friend who was shoplifting. Such activities would seem implausible were her pain as extreme as she has alleged. Even though she indicated that she took frequent breaks to perform chores, she still needed to stand and would have been unable to perform such activities while holding a cane. Although Dr. Singh indicated drowsiness from medications, the record, as summarized above, documents specific denials of medication side effects. I further note that Dr. Singh's opinion appears to rely in part on an assessment of the claimant's mental

work-related functioning, though he provided no significant treatment in that regard, other than prescription medication, and the mental health portion of the opinion appears to rest on an area outside his area of expertise. In conclusion, I give little weight to Dr. Singh's assessment.

(R. at 958–59.) Plaintiff argues, however, that Dr. Singh's opinion was consistent with the opinions of Dr. Kendrick and Nurse Cranston as well as Plaintiff's history of pain management. (ECF No. 16 at 8–11.) Plaintiff specifically contends that Dr. Kendrick opined that "absenteeism was reasonable and that Dr. Singh's opinion about absenteeism was credible," which was supported by the opinion of Nurse Cranston. (*Id*. at 9.)

The Undersigned finds that the ALJ provided good reasons for according little weight to Dr. Singh's opinion that Plaintiff would be absent three times a month and that her complaints of pain were not credible. First, the Undersigned agrees with the Commissioner (ECF No. 24 at 8–9) that Plaintiff has misstated Dr. Kendrick's testimony regarding absenteeism. As set forth in detail above, Dr. Kendrick testified that Plaintiff "would miss some days" of work, but that there was "no way to predict" whether she would miss several days of work a month. (R. at 1000.) While he went on to testify that missing some work would date back to the entire time she was under pain management, he never testified that Dr. Singh's opinion regarding absenteeism was "reasonable." (*Id*.)

In addition, while Plaintiff argues that Dr. Singh's opinion is consistent with the opinion of Nurse Cranston Plaintiff would frequently miss days of work, the ALJ properly gave "little weight" to this opinion because Nurse Cranston's medical opinion was not included among the "acceptable sources" of medical evidence and because her opinion was inconsistent with other evidence in the record. (R. 959.) As a preliminary matter, the regulations in effect at the time the ALJ issued his decision on June 24, 2016, did not include nurse practitioners as one of the

recognized types of "acceptable medical sources," identifying them instead as "other sources." *Compare* former 20 C.F.R. §§ 404.1513(a) & 416.913(a) *with* former 20 C.F.R. §§ 404.1513(d)(1) & 416.913(d)(1). "While recent revisions to the regulations now include licensed advanced practice registered nurses among the list of 'acceptable medical sources,' the revisions are expressly not retroactive." *Wooden v. Berryhill*, 1:16-cv-01494, 2017 WL 2644128, at *13 (N.D. Ohio June 1, 2017) (citing, *inter alia*, 20 C.F.R. §§ 404.1502(a)(7) & 416.902(a)(7) ("Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice" (only with respect to claims filed (see § 416.325) on or after March 27, 2017))), *adopted by* 2017 WL 2634480 (N.D. Ohio June 19, 2017). Moreover, for the reasons discussed below, especially related to Plaintiff's activities of daily living, the ALJ properly accorded little weight to Nurse Cranston's opinion because it was inconsistent with other evidence in the record.

Next, Plaintiff challenges the ALJ's assessment of Dr. Singh's opinion of Plaintiff's complaints of pain. "The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor." *Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007) (declining to disturb the ALJ's credibility determination, stating that: "[w]e will not try the case anew, resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)). This deference extends to an ALJ's credibility determinations "with respect to [a claimant's] subjective complaints." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009) (quoting *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987)).

Despite this deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters*, 127 F.3d at 531. Furthermore, the ALJ's decision on credibility must be "based on a consideration of the entire record." *Rogers*, 486 F.3d at 247 (internal quotation omitted). An ALJ's explanation of his or her credibility decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at 248.

"Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531. In addition, the Regulations list a variety of factors an ALJ must consider in evaluating the severity of symptoms, including a claimant's daily activities; the effectiveness of medication; and treatment other than medication. 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2016 WL 1119029 (March 16, 2016); *but see Storey v. Comm'r of Soc. Sec.*, No. 98-1628, 1999 WL 282700, at *3 (6th Cir. Apr. 27, 1999) ("[T]he fact that [the ALJ] did not include a factor-by-factor discussion [in his credibility assessment] does not render his analysis invalid.").

In evaluating Plaintiff's credibility with respect to his subjective claims, the ALJ must determine whether there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). Second, if the ALJ finds that such impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities. *Kalmbach v. Comm'r or Soc. Sec.*, 409 F. App'x 852, 863 (6th Cir. 2011). Pursuant to SSR 16-3p, the ALJ must evaluate seven factors in determining credibility:

In addition to using all the evidence to evaluate the intensity, persistence, and limiting effects of an individual's symptoms, we will also use the factors set forth in 20 CFR 404.1529(c)(3) and 416(c)(3). These factors include:

1. The individual's daily activities;
2. The location, duration, frequency, and intensity of pain other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3P, 2016 WL 1119029 (March 16, 2016).

SSR 16-3p tasks the ALJ with explaining his credibility determination with sufficient specificity as "to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Brothers v. Berryhill*, Case No. 5:16-cv-01942, 2017 WL 29125, at *11 (N.D. Ohio June 22, 2017) (citing *Rogers*, 486 F.3d at 248).

Here, the ALJ did not give significant weight to Dr. Kendrick's testimony to the extent "it could be could be construed as supporting the need for excessive missed days of work due to the claimant's pain complaints" because the medical evidence "routinely documents that the claimant was in no acute distress and had no incontinence despite her repeated allegations of extreme pain and her testimony alleging severe incontinence." (R. at 957.) He also concluded that Plaintiff's statements regarding the intensity, persistence, and limiting effects of these

symptoms are not entirely consistent with evidence in the record. (R. at 953.) This opinion enjoys substantial support in the record. For example, the ALJ noted that Plaintiff presented in "no acute distress" in multiple medical visits during the period of March 2011 through January 2016. (R. at 952–56.) Similarly, the ALJ further noted that he "observed that she sat at the hearing [in May 2016] and the prior hearing in no apparent distress." (R. at 953.) *See Infantado*, 263 F. App'x at 475 (stating that the ALJ's credibility assessment is entitled to great weight because the ALJ had the opportunity to observe the witness's demeanor). The ALJ also noted normal x-ray results and mild or moderate MRI and/or diagnostic findings over a period of years. (R. at 953 (noting normal findings in thoracic and lumbar spine x-rays taken in November 2009 and lumbar spine x-rays taken in January 2010), 954 (noting an MRI taken in February 2010 revealed only moderate bilateral facet arthropathy with no significant central canal or neural foraminal stenosis and that electrodiagnostic testing revealed normal findings, except for a prolonged right H-reflex in latency and diminished in amplitude; thoracic and lumbar spine x-rays taken in November 2011 revealed normal findings and MRI of thoracic spine revealed normal findings; MRI of the lumbosacral spine revealed a stable appearance with only a small disc protrusion; unremarkable diagnostic findings in December 2011), 955 (noting that a February 2015 MRI of the lumbosacral spine actually revealed a mild decrease in size of a soft disc protrusion at the L5-S l level, though there was a suggestion of a new annular tear at that level, only nominal soft disc displacement of the L3-4 level, and only shallow soft disc displacement at the L4-5 level without compressive discopathy; in May 2015, Plaintiff had positive muscoskeletal findings, but SLR findings were normal; August 2015 flexion-extension x-rays were normal).) Although Dr. Singh reported that the medications made Plaintiff drowsy,

elsewhere in the record she denied side effects and stated that the medication helped her pain. (R. at 954 (stable on medications with no side effects in April 2012), 956 (in January 2016, while medications did not last long enough, they controlled her pain and she denied side effects).) Plaintiff admitted in May 2014, that she had an overall good quality of life and normal functioning. (R. at 955, 1535.) She previously denied bladder problems. (R. at 955 (denying bowel and bladder dysfunction in December 2015), 956 (no incontinence in January 2016).) In addition, while Plaintiff was prescribed a TENS unit and testified that it helped her muscles, her admission that she does not use it often because she would have to wear it all day undermines her claims of the severity of her pain. (R. at 953, 1042–43.) This evidence, along with Plaintiff's activities of daily living discussed below, provides substantial evidence to support the ALJ's treatment of Dr. Singh's opinion. Accordingly, "'even if there is substantial evidence in the record that would have supported an opposite conclusion[,]'" *Blakley*, 581 F.3d at 406 (internal citations omitted), the Court defers to the ALJ's decision.

Finally, while the ALJ did not find Plaintiff's statements about the limiting effects of her symptoms entirely consistent with the medical evidence and Dr. Kendrick testified that Plaintiff's pain complaints were credible, the ALJ gave deference to Plaintiff's lower extremity complaints and imposed greater restrictions than those recommended by Dr. Kendrick. (R. at 957.) Despite finding her pain complaints credible, Dr. Kendrick nevertheless determined that Plaintiff could perform a limited range of sedentary work. (R. at 982, 1000, 1627.) Notably, the ALJ's RFC was more restrictive than the limitations identified by Dr. Kendrick. (R. at 942, 982, 1627.) For example, the ALJ limited Plaintiff to occasionally operating left foot controls and

never operating right foot controls, while Dr. Kendrick's opinion contained no such restrictions. (*Id*.)

For all of these reasons, the ALJ's treatment of Dr. Singh's opinion about Plaintiff's pain complaints and resulting absenteeism is supported by substantial evidence.

### 2. Dr. Singh as a general practitioner and Plaintiff's conservative treatment

The ALJ assigned "little weight" to Dr. Singh's opinion because, *inter alia*, "Dr. Singh is not a specialist in neurology or orthopedics and his treatment records confirm only conservative treatment that seems inconsistent with the level and frequency of treatment that one would reasonably expect in light of the substantial limitations he assessed." (R. at 958.)

The Undersigned finds that the ALJ provided good reasons for according little weight to Dr. Singh's opinion. First, the ALJ properly considered that Dr. Singh is not an expert in neurology or orthopedics. *See* 20 C.F.R. § 416.927(c)(5) ("Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Plaintiff concedes that Dr. Singh is a general physician and that his own treatment of her was conservative, but notes that Dr. Singh referred her for evaluations by Drs. Bay, Bonasso, and Batra, and for pain management. (ECF No. 16 at 11.) Plaintiff goes on to speculate that "it appears that Dr. Bay, Dr. Bonassso, and Dr. Batra all forwarded copies of their records to keep him abreast of developments in her case, thus his [Dr. Singh's] opinion was well-informed." (*Id*.)

The Undersigned, however, is not persuaded that referrals to these specialists undermine the ALJ's treatment of Dr. Singh's opinion. While it is true that Drs. Bay, Bonasso, and Batra evaluated Plaintiff, she points to nothing in those records that supports her contention that these

specialists found that Plaintiff had disabling work-related limitations. While Dr. Bay noted that a MRI from February 2010 showed a minor midline disk bulge at L4-5, the MRI showed no stenosis or herniated disks. (R. at 1460.) Dr. Bay opined that Plaintiff had "sciatica that sounds like nerve pain[,]" but Dr. Bay concluded that that Plaintiff did not have a surgically treatable back lesion and never referred to any work limitations caused by her condition. (R. at 1466–67.) In addition, as the Commissioner points out (ECF No. 24 at 10), when seen in August 2015, Dr. Bonasso noted that Plaintiff's examination was difficult to assess because although Plaintiff had limited motion in her right leg, she had normal strength in her left leg and was able to walk. (R. at 1305.) Dr. Bonasso reported that Plaintiff's MRI revealed some disc bulging, but he still would not recommend surgery and did not impose any work-related limitations. (*Id.*) Similarly, Dr. Batra, a pain management specialist, recommended steroid injections for Plaintiff's assessed lumbar radiculitis and spondylosis as well as internal disk derangement, rather than recommending surgery or any restrictions on Plaintiff's ability to work. (R. at 379-80.)

Plaintiff nevertheless insists that Dr. Singh's conservative treatment has little bearing on her pain levels and his opinion regarding the impact of her pain, "which was found to be credible by the medical expert Dr. Kendrick." (ECF No. 16 at 11.) As previously discussed, however, Dr. Kendrick never testified that Dr. Singh's opinion regarding Plaintiff's limitations resulting from her pain were credible or reasonable. He agreed that she would miss "some days" of work, but said there was no way to predict how many days per month she would miss. (R. at 1000.) Moreover, as set forth above, substantial evidence supports the ALJ's credibility determination. Finally, the ALJ's RFC was more restrictive than the limitations articulated by Dr. Kendrick. (R. at 942, 982, 1627.)

In short, Plaintiff's arguments regarding the ALJ's reliance on the fact that Dr. Singh was not a specialist and that he gave only conservative treatment fail to establish that the ALJ's decision was not supported by substantial evidence.

### 3. Unreliable findings

In assigning "little weight" to Dr. Singh's opinion, the ALJ stated, *inter alia*, that "[t]hough Dr. Singh's treatment notes documented musculoskeletal findings on examination, Dr. Kendrick more recently explained that the findings were inconsistent and unreliable, particularly with respect to the reports of a foot drop and foot dragging." (R. at 958.) Plaintiff advances the following error with the ALJ's statement in this regard:

> This assertion bears primarily on Dr. Singh's opinion relating to the medical necessity for the use of a cane. While Plaintiff certainly disagrees with Dr. Kendrick's opinion on this issue, the Error complained of in this Memorandum instead focuses on the ALJ's treatment of Plaintiff's pain complaints and the likelihood of work-preclusive absenteeism, and this statement is therefore largely irrelevant to the instant issues.

(ECF No. 16 at 11.)

It is not entirely clear what Plaintiff intends by this argument. The Undersigned assumes that Plaintiff is asking the Court to disregard Dr. Singh's opinion that a cane is medically necessary, an opinion with which Dr. Kendrick disagreed, because whether a cane is necessary is irrelevant to the ALJ's assessment of her pain complaints and absenteeism. This argument is unavailing for two reasons. First, the Undersigned agrees with the Commissioner that the ALJ was free to consider Dr. Kendrick's criticism of any part of Dr. Singh's opinion in deciding how to weigh Dr. Singh's opinion. *Cf. Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (identifying consistency of the opinion with the record as a whole as a consideration in evaluating a treating physician's opinion); *Schmiedebusch v. Comm'r of Soc. Sec.*, 536 F. App'x

637, 649 (6th Cir. 2013) ("The ALJ retains a 'zone of choice' in deciding whether to credit conflicting evidence."); *Price v. Comm'r of Soc. Sec.*, 342 F. App'x 172, 175–76 (6th Cir. Aug. 18, 2009) ("Where the opinion of a treating physician is not supported by objective evidence or is inconsistent with the other medical evidence in the record, this Court generally will uphold an ALJ's decision to discount that opinion."). Second, for the reasons previously discussed, the ALJ's treatment of Dr. Singh's opinion regarding Plaintiff's complaints of pain and effects on absenteeism are supported by substantial evidence.

### 4. Inconsistent with activities of daily living

In assigning "little weight" to Dr. Singh's opinion, the ALJ considered, *inter alia*, Plaintiff's activities of daily living, reasoning as follows:

> Dr. Singh's assessed limitations are also inconsistent with intermittent reports summarized above that the claimant was active and with her documented activities of living as summarized throughout this decision, including doing chores, light housework, watching television, reading, sharing cooking responsibility with her husband, dishwashing, vacuuming, driving a car (albeit that she alleged that she drove two-footed), having 150 friends on Facebook, doing her fingernails in a very decorative fashion, and getting arrested when with a friend who was shoplifting. Such activities would seem implausible were her pain as extreme as she has alleged. Even though she indicated that she took frequent breaks to perform chores, she still needed to stand and would have been unable to perform such activities while holding a cane.

(R. at 958–59.)

Plaintiff's criticism of the ALJ's consideration of her daily activities in this regard rests on the recommendation and decision issued in the prior action filed in this Court, *Sanders v. Commissioner of Social Security,* No. 2:14-cv-00249 ("the prior action"). (ECF No. 16 at 11–15.) Plaintiff contends that, as in the prior action, ALJ Earnheart's consideration of Plaintiff's activities do not undermine her pain complaints or Dr. Singh's absenteeism opinion. (*Id.*) In so

arguing, Plaintiff points to specific daily activities and explains why these do not support the

ALJ's decision.  (*Id.*)

However, as the Commissioner points out (ECF No. 24 at 12–13), the recommendation

and the order in the prior action did not state that the ALJ could not rely on any of Plaintiff's

daily activities that were inconsistent with Dr. Singh's opinion.  (R. at 1096–97, 1099–1119.)

Instead, the Magistrate Judge assigned to the prior action noted that the previous ALJ

mischaracterized Plaintiff's activities and discussed three specific activities, reasoning as

follows:

> . . . [T]he ALJ pointed to three things Plaintiff said that were not consistent with
> Dr. Singh's very restrictive view of her capabilities: that she was able to walk
> without her cane, to drive, and to do household chores.  Plaintiff's actual
> testimony on these points was that without a cane, she was susceptible to falls,
> and that the only place she did not use it was inside her home, where she could
> grab onto something if she lost her balance. She said she could drive but it was
> very painful, and that she could not persist at any household chore for more than
> five minutes; vacuuming was done one room at a time, and she needed to lie
> down after she finished. Any inconsistencies between this testimony and Dr.
> Singh's findings are so inconsequential as to be virtually meaningless.  Thus, this
> part of the ALJ's rationale is not supported by the record.

(R. at 1114.)  The District Judge assigned to the prior action adopted this recommendation and

remanded the case, agreeing that the previous ALJ's recitation of Plaintiff's activities was

inaccurate.  (R. at 1097 ("This Court recites these facts, not to weigh evidence, but to note that

the decision below mischaracterised the findings of Dr. Singh as inconsistent with the record.").)

Here, there is no evidence that ALJ Earnheart mischaracterized Plaintiff's daily activities

in the present action.  He identified Plaintiff's daily activities, but also described her limitations

in performing those activities.  (R. at 951 (noting that Plaintiff drove two-footed and drove only

to the grocery store and doctors' appointments and that she prepared only quick meals), 959 (noting that Plaintiff drove two-footed and took frequent breaks to perform chores).)

Even accounting for these limitations, ALJ Earnheart went on to explain that Plaintiff would still need to stand when performing some of her daily activities and would have been unable to perform such activities while holding a cane. (R. at 959.) Notably, Dr. Kendrick found no support for the use of a cane (R. at 985) and Plaintiff admitted to Dr. Swearingen that she did not use any assistive devices (R. at 610). The ALJ's consideration of these inconsistences was reasonable. *West v. Comm'r of Soc. Sec.*, 240 F. App'x 692, 697 (6th Cir. 2007); *cf. Wilson*, 378 F.3d at 544; *Schmiedebusch*, 536 F. App'x at 649; *Price*, 342 F. App'x at 175–76.

Plaintiff, however, insists that her daily activities are not inconsistent with her pain complaints. (ECF No. 16 and 12–13.) Specifically, Plaintiff argues that while she was able to read and watch television, her pain (or medications) "affected her ability to concentrate." (*Id.*) The evidence in the record undermines Plaintiff's assertion. She reported to Dr. Swearingen that her reading and writing skills are "good" and that she watches television. (R. at 611.) Upon evaluation, Dr. Swearingen concluded that Plaintiff's "concentration and persistence was good." (R. at 12.) In addition, in March 2014, Plaintiff reported that she plays the game "Words with Friends" (R. at 1365), "an online Scrabble game with a private instant messaging feature." *Heller v. Bedford Cent. Sch. Dist.*, 144 F. Supp. 3d 596, 606 (S.D. N.Y. 2015). *Cf. Baumer v. Berryhill*, No. 17–cv–01099, 2017 WL 5494383, at *10 (D. Colo. Nov. 16, 2017) (affirming ALJ's decision that claimant was not disabled where, *inter alia*, the claimant "plays 'Words with

Friends,' a game [the ALJ] said 'clearly requires the ability to concentrate and to persist to the end of or conclusion of the game'").

While Plaintiff argues that accessing Facebook does not undermine her pain complaints, the ALJ properly considered this activity when considering all of her other activities and their impact on her pain complaints. *Cf. Littleton v. Comm'r of Social Sec.*, 2013 WL 6090816, at *13 (N.D. Ohio Nov. 19, 2013) (affirming Commissioner's decision where, *inter alia*, the ALJ "opined that [the claimant's] daily activities, including her ability to drive, spend time on the internet and Facebook, read the news, and her hobbies were inconsistent with her allegation that she cannot sufficiently concentrate").

Plaintiff also takes issue with the ALJ's observation that she was capable of "doing her fingernails in a very decorative fashion," arguing that she testified that the nails she wore to the hearing were glue on nails that she purchased from a Dollar Store. (ECF No. 16 at 13.) The Undersigned is not persuaded that observation of Plaintiff's decorative nails, which constitutes a small portion of the ALJ's analysis, was in error or warrants remand. *See Conant v. Comm'r of Social Sec.*, 3:15-cv-500, 2016 WL 6072386, at *5 (N.D. N.Y. Oct. 17, 2016) (finding that it was reasonable for the ALJ to consider the claimant's decorated fingernails, even though they were purchased from a drug store, and that these observations "were only one factor" in the ALJ's credibility determination); *c.f. Littleton*, 2013 WL 6090816, at *13 (affirming Commissioner's decision and stating, *inter alia*, that "[w]hile [the claimant] takes issue with the ALJ's layperson observations, this constitutes only a minor portion of the ALJ's credibility analysis").

In addition, Plaintiff complains that the ALJ improperly considered her shoplifting charge when assessing her complaints of pain. (ECF No. 16 at 13–14.) However, as with the fingernail

observation, this fact is only a minor part of the many facts the ALJ considered. Moreover, as the Commissioner points out (ECF No. 24 at 15), Plaintiff's shoplifting charge reveals that she was out shopping with a friend. This fact undermines her earlier statement that her husband did the shopping (R. at 49–50) and is another factor the ALJ could consider when assessing Plaintiff's credibility.

Finally, "'even if there is substantial evidence in the record that would have supported an opposite conclusion[,]'" *Blakley*, 581 F.3d at 406 (internal citations omitted), the Court defers to the ALJ's decision.

### 5. Reliance on mental work-related functioning assessment

Plaintiff goes on to argue that the ALJ's decision "appears to rely in part on an assessment of the claimant's mental work-related functioning." (ECF No. 16 at 15.) She devotes one short paragraph to this position and does not develop this argument. (*Id*.) Instead, she contends that Dr. Singh's opinions "are focused on pain and the impact that pain would likely have on Plaintiff's performance of work-related activities, including concentration. It is unclear the basis on which the ALJ makes this assertion." (*Id*.) She also argues that the ALJ's weighing of Dr. Singh's treating source opinion was not supported by good reasons or substantial evidence for the reasons "outlined above, and particularly with the support of Dr. Kendrick[.]" (*Id*.)

As discussed above, however, Dr. Kendrick never testified that Dr. Singh's opinion about absenteeism was reasonable. To the extent that Dr. Kendrick agreed that Plaintiff's pain complaints were credible, the Undersigned has already discussed this, including noting that the ALJ's RFC was more limited than the restrictions recommended by Dr. Kendrick.

34

Moreover, the Commissioner correctly notes that Dr. Singh did rely on mental factors when assessing Plaintiff's work-related functions and limitations and the ALJ gave good reasons for discounting such opinion. (ECF No. 24 at 17–18.) Specifically, Dr. Singh reported that "emotional factors contribute[d]" to the severity of Plaintiff's symptoms and functional limitations. (R. at 880.) Dr. Singh further identified depression and anxiety as psychological conditions affecting Plaintiff's pain. (R. at 881.) He opined that her pain, which was affected by these conditions, would often interfere with her ability to maintain attention and concentration. (*Id*.) Accordingly, at least some portions of Dr. Singh's opinion were based on Plaintiff's mental conditions or complaints. As set forth above, however, Dr. Singh was a general practitioner and it was reasonable for the ALJ to note that mental impairments were outside of Dr. Singh's expertise. *See* 20 C.F.R. § 416.927(c)(5) ("Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

In short, the ALJ properly weighed and assessed Dr. Singh's opinion regarding absenteeism and pain complaints, which was supported by substantial evidence. It is therefore **RECOMMENDED** that Plaintiff's first contention of error be **OVERRULED**.

## B. Evaluation of Plaintiff's Symptoms

Plaintiff also argues that the ALJ's evaluation of her symptoms fails to follow the requirements of SSR 16-3p and is not supported by substantial evidence. (ECF No. at 16–17.) In advancing this contention of error, Plaintiff relies on her prior arguments, "including Plaintiff's long treatment history for chronic pain and her limited daily activities" and that Dr. Kendrick found her pain complaints to be credible. (*Id*. at 17.)

As set forth above, SSR 16-3p requires an ALJ to evaluate seven factors when determining credibility:

1. The individual's daily activities;
2. The location, duration, frequency, and intensity of pain other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p, 2016 WL 1119029 (March 16, 2016). SSR 16-3p tasks the ALJ with explaining his credibility determination with sufficient specificity as "to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Brothers v. Berryhill*, Case No. 5:16-cv-01942, 2017 WL 29125, at *11 (N.D. Ohio June 22, 2017) (citing *Rogers*, 486 F.3d at 248).

The Undersigned has already explained in detail above why the ALJ's credibility determination was supported by substantial evidence, including consideration of Plaintiff's daily activities, symptoms, and medication. Moreover, the ALJ noted treatment, other than medication, to relieve pain and other measures Plaintiff took to relieve pain. (R. at 953 (noting that Plaintiff had a TENS unit, lays down two to three times a day with a pillow between her knees, received steroid injections), 955 (participated in physical therapy).) He also considered evidence that Plaintiff was incontinent and needed a cane. (R. at 952.) While Dr. Kendrick

found Plaintiff's pain complaints credible and the record reflects a history of pain management, substantial evidence supports the ALJ's conclusion and the Court must defer to it "'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley*, 581 F.3d at 406 (internal citations omitted). Accordingly, applying the applicable deferential standard of review, the ALJ's evaluation of Plaintiff's symptoms was not erroneous. It is therefore **RECOMMENDED** that Plaintiff's second contention of error be **OVERRULED**.

## C.      Dr. Kendrick's Testimony and Plaintiff's RFC

Finally, Plaintiff contends that he ALJ "failed to build and [sic] accurate and logical bridge between the Dr. Kendrick's testimony and his determined RFC, which erroneously fails to address rates of absenteeism." (ECF No. 16 at 17.) Specifically, Plaintiff argues that the ALJ did not properly explain how "he dealt with Dr. Kendrick's testimony about absenteeism due to pain[,]" noting that any absenteeism during the probationary period in the first 30 to 180 days of work is work preclusive. (*Id*. at 17–18.) Plaintiff also contends that the ALJ's hypothetical to the VE was incomplete because it did not include any restrictions related to absenteeism. (*Id*. at 18.) Plaintiff goes on to argue that the ALJ did not completely reject Dr. Kendrick's opinion about absenteeism and therefore it was "paramount" for the ALJ to further explain his decision. (*Id.*; R. at 957 (giving significant weight to Dr. Kendrick's testimony "except to the extent that his testimony could be construed as supporting the need for excessive missed days of work due to the claimant's pain complaints").)

Plaintiff's arguments are not well taken. The Undersigned has previously discussed that Plaintiff has misstated Dr. Kendrick's testimony regarding absenteeism. Dr. Kendrick testified that Plaintiff "would miss some days" of work, but that there was "no way to predict" whether

she would miss several days of work a month. (R. at 1000.) While he went on to testify that missing some work would date back to the entire time she was under pain management, he never testified that Dr. Singh's opinion regarding absenteeism was "reasonable." (*Id.*) Dr. Kendrick also never opined as to whether Plaintiff would be absent during a probationary period and it cannot be assumed that any missed days would be during the probationary period. Similarly, Dr. Kendrick never testified that Plaintiff would miss more than one to one and a half days of work per month, which is the number of missed days identified by the VE that a person would have to miss to be unable to sustain competitive employment. (R. at 1000, 1013.) Notably, even though he acknowledged that Plaintiff would miss "some days" of work, Dr. Kendrick offered no restrictions based on absenteeism.

Equally unavailing is Plaintiff's argument that the hypothetical to the VE was incomplete because it did not include any restrictions based on absenteeism. (ECF No. 16 at 18.) As the above-quoted portions of the hearing transcript establish, however, the VE was questioned about how many absences would be tolerated in the workplace. (R. at 1013.) The VE responded that "[a] day to a day and a half a month. 18 days out of the year for at-will employment." (*Id.*) The VE also answered "No" when asked whether a person in excess of those tolerances could sustain competitive employment. (*Id.*) When asked later whether absenteeism is tolerated during the probationary period, the VE responded, "generally no." (R. at 1014.) Accordingly, the Court is not persuaded that the ALJ's hypothetical to the VE was defective.

Plaintiff's argument that the ALJ did not completely reject Dr. Kendrick's opinion on absenteeism and therefore such restriction should have been included in the RFC is unavailing. The ALJ's RFC determination must include "medically determinable impairment(s) . . . which . .

. may cause limitations and restrictions which affect other work-related abilities." 20 C.F.R. § 404.1545(d). "[T]he ALJ 'is required to incorporate only those limitations [he] accept[s] as credible' " into the RFC. *Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 336 (6th Cir. 2007) (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)). A fair reading of the ALJ's decision and the VE's testimony, taken together, reflects that the ALJ did not find that Plaintiff's absenteeism affected her ability to sustain competitive employment, *i.e.*, he was not persuaded that Plaintiff would miss in excess of a day to a day and a half a month or eighteen days out of the year. (R. at 957, 1013.) Because he did not find that she would miss excessive days of work, he did not include such a limitation in the RFC. Finally, as the Undersigned has previously pointed out, the ALJ's RFC contained more limitations than Dr. Kendrick's articulated limitations.

For all of these reasons, the Undersigned finds that the ALJ did build an accurate and logical bridge between the Dr. Kendrick's testimony and the determined RFC, which is supported by substantial evidence. It is therefore **RECOMMENDED** that Plaintiff's third contention of error be **OVERRULED**.

## IX.  CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## X.     PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that

party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


Date: February 16, 2018                         _____ /s/ *Elizabeth A. Preston Deavers*
                                                ELIZABETH A. PRESTON DEAVERS
                                                UNITED STATES MAGISTRATE JUDGE